## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JENNIFER MYERS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 02: 10-cv-1254 |
| | ) | |
| MICHAEL J. ASTRUE | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

June 28, 2011

## I.        Introduction

Plaintiff, Jennifer Myers ("Plaintiff"), brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c), for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403; 1381-1383(f).

## II.        Background

### A.        Facts

Plaintiff was born on July 18, 1981 and was twenty-seven years old on the date of her administrative hearing, making her a "younger person" whose age does not affect her ability to adjust to other work pursuant to 20 C.F.R. § 416.963.  She is a high school graduate, capable of communicating in English, with past relevant work experience as a dental assistant, assembler, and laborer.  (R. 24, 25).  A vocational expert ("VE") who testified at

Plaintiff's administrative hearing described the job of dental assistant as light, skilled work, while assembler and laborer are classified as unskilled in nature and require medium-to-heavy exertional work. (R. 34).

Plaintiff went on medical leave from her employment on September 27, 2007, due to depression, anxiety, panic attacks, and syncope. (R. 124). Although she attempted to return to work on November 11, 2007, she stopped working again on January 9, 2008 because her condition had worsened. (R. 13, 25). The administrative law judge considered this an "unsuccessful work attempt," and found that Plaintiff had not engaged in substantial gainful work activity since her onset date. (R. 13, 25).

**B.      Plaintiff's Mental Health Treatment History**

The record reflects that Plaintiff sought treatment at Brookville Hospital on May 29, 2007 experiencing epigastric discomfort. (R. 217). Following abdominal x-rays, which revealed no abnormalities, the attending physician administered a GI cocktail, recommended Prilosec, and instructed Plaintiff to consult her primary care physician, Barry Snyder, M.D., for a follow-up appointment. (R. 218, 220).

The following day, Plaintiff presented to Dr. Snyder, complaining of light-headedness, dizziness, and slight headaches. (R. 328). She underwent a title table study and a CT scan, both of which yielded normal results. (R. 178, 328). However, Plaintiff's symptoms persisted, and in early July 2007 she requested a note from Dr. Snyder excusing her from working on the "crating line" at the manufacturing plant where she was employed, which she complained made her feel dizzy. (R. 331). Dr. Snyder provided the note. (R. 332).

Plaintiff returned to Dr. Snyder's office on July 27, 2007 reporting that she felt better since starting on Prilosec. (R. 333). In Dr. Snyder's assessment, he noted that Plaintiff's depression was improved on Prozac; her vasodepressor syncope (normal tilt table study) was improved; and her GERD was controlled on Prilosec. (R. 333).

Office notes of Dr. Snyder reflect that he increased Plaintiff's Prozac dose to 40 milligrams on September 19, 2007 after Plaintiff called to report that the medication was not working at its previous level. (R. 336). Plaintiff followed up with Dr. Snyder on September 25, 2007 and complained of fatigue, depression, and difficulty sleeping. (R. 337). She also reported trouble concentrating at work, which led Dr. Snyder to note that "work is a major issue." (R. 337). Accordingly, Dr. Snyder wrote Plaintiff a note excusing her from work until at least October 18, 2007 and advised her to contact psychologist Albert DiGilarmo, Psy.D., to arrange mental health treatment. (R. 337, 339). In addition, Dr. Snyder discontinued Plaintiff's Prozac and prescribed a trial dose of Effexor. (R. 337).

Plaintiff's initial appointment with Dr. DiGilarmo was on October 1, 2007, at which time he noted that Plaintiff complained of depression and anxiety accompanied by panic attacks. (R. 229). Plaintiff further complained of exhaustion and difficulty sleeping. (R. 331). Plaintiff stated that her symptoms began approximately ten years ago, but had worsened because of her "financial situation." (R. 332). Upon examination, Plaintiff was assessed with a current Global Assessment of Functioning[1] ("GAF") score of 48, with a past-year highest GAF score of 65. (R. 229).

_____

[1] A patient's GAF score measures, on a scale of 0-100, the overall effect of a patient's mental health disorder on his

Plaintiff next saw Dr. DiGilarmo on October 10, 2007.  (R. 277).  At that time she reported the same symptoms she conveyed to Dr. Snyder, namely sadness, depression, worthlessness, and anxiety along with panic.  (R. 277).  In his notes, Dr. DiGilarmo indicated that Plaintiff's depression and anxiety were creating increased obstacles to working.  (R. 277).  That same day, Dr. DiGilarmo completed a short-term disability insurance form for Plaintiff, opining that Plaintiff's "depression and anxiety is preventing her from working productively and safely" through November 15, 2007.  (R. 280-82).

At a follow-up appointment with Dr. Snyder on October 18, 2007, Plaintiff's depression had improved, as Dr. Snyder's notes reflect that Plaintiff appeared more animated and less stressed.  (R. 343).  Dr. Snyder further noted that Plaintiff's GERD was stable on Prilosec, and that her near syncope was stable and no longer required medication. (R. 343).

Four days later Plaintiff returned to Dr. DiGilarmo.  (R. 274).  Following a mental status examination, Dr. DiGilarmo noted that Plaintiff had poor concentration and moderately impaired self-esteem; however, she exhibited no significant abnormalities.  (R. 274). Similarly, at her next appointment, on November 5, 2007, a mental status evaluation revealed moderately decreased motor activity, moderate social withdrawal, and moderate limitations in mood, affect, thought content, and perception.  (R. 271).  Plaintiff also reported having trouble sleeping.  (R. 274).  Following the appointment, Dr. DiGilarmo contacted Dr. Snyder to discuss Plaintiff's sleep issues, and Dr. Snyder subsequently prescribed Ativan to Plaintiff.

---

or her ability to function in activities of daily living, as well as socially and occupationally. *See Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Revised* 34 (4th ed. Text Revision, American Psychiatric Association 2000).

(R. 345). Two weeks later, Plaintiff called Dr. Snyder reporting recurrences of lightheadedness, for which Dr. Snyder again prescribed Atenolol. (R. 346).

On December 13, 2007, Plaintiff presented to Dr. Snyder complaining of pain in her lower abdomen. (R. 356). She was diagnosed with an abscess, for which she was prescribed new medications and granted a five-day medical leave of absence from work. (R. 349, 351-60). Dr. Snyder also indicated that Plaintiff's depression had "substantially improved," but that she continued to experience some panic attacks. (R. 356).

At Plaintiff's next session with Dr. DiGilarmo, on January 10, 2008, she was assessed as having poor concentration; moderately limited mood, affect, thought content, and perception; and moderate hostility. (R. 260). Dr. DiGilarmo noted that Plaintiff's depression and anxiety had worsened. (R. 260). She was also experiencing increased work-related stress. (R. 260). Dr. DiGilarmo indicated that Plaintiff needed a medication re-check, for which he referred her back to Dr. Snyder. (R. 260, 266).

Plaintiff followed up with Dr. Snyder on January 15, 2008 complaining that her depression had not significantly improved despite her medications. (R. 362). Although Dr. Snyder noted that Dr. DiGilarmo felt Plaintiff had suicidal ideation, her mental status examination was normal. (R. 362-63). Dr. Snyder's impression was that while Plaintiff's depression was not currently controlled, she had shown some improvement since the prior week. (R. 363). He nonetheless increased Plaintiff's Trazodone dose and noted that she should be off work. (R. 363). In addition, he recommended exercise to improve Plaintiff's mood and weight. (R. 364). Two days later, Dr. DiGilarmo completed a second short-term

disability form for Plaintiff, in which he noted that her significant depression, anxiety, and panic attacks continued to prevent her from working. (R. 258-59).

On January 29, 2008, Plaintiff presented to both Dr. Snyder and Dr. DiGilarmo with complaints of stomach pain and fatigue; however, her depression was reportedly better since she stopped working. (R. 257, 367). Dr. Snyder's psychological examination of Plaintiff was normal, but he decreased her dose of Effexor and directed her to stay off Trazodone to correct some side effects. (R. 367-68). Two weeks later, Dr. Snyder recorded in his notes that Plaintiff was "off all of her depression medications except Effexor." (R. 374). At a February 21, 2008 follow-up appointment with Dr. Snyder, Plaintiff reported that she was feeling "ok" on her lower dose of Effexor. (R. 396). In addition, she had not experienced any fainting spells and reportedly felt less tired since her last appointment. (R. 396). Thus, Dr. Snyder found that Plaintiff's depression was under reasonable control and maintained the levels of her medications. (R. 396). After Plaintiff's next appointment, on March 5, 2008, Dr. Snyder indicated that Plaintiff's depression was "getting better," but that she remained a "little irritable." (R. 376). As a result, Dr. Snyder adjusted her dose of Effexor. (R. 376). In addition, he indicated that Plaintiff was less fatigued after she discontinued her Atenolol. (R. 376).

On March 10, 2008, Dr. DiGilarmo completed another short-term disability form for Liberty Mutual, in which he assessed a current GAF score of 52. (R. 254). He noted that Plaintiff appeared sad and that her affect was constricted. (R. 252). However, she was well-groomed, well-developed, alert, oriented, and demonstrated good hygiene. (R. 252). Dr.

DiGilarmo also noted that Plaintiff's immediate memory was poor, but her short-term memory and long-term memory were both good. (R. 252). While Dr. DiGilarmo indicated that he was not familiar with Plaintiff's job responsibilities and could not comment on what work-related tasks she could perform, he nonetheless opined that "Plaintiff is currently experiencing depression and anxiety with panic that does interfere with job duties." (R. 253).

During appointments with Dr. DiGilarmo in late March and early April 2008, Plaintiff again reported improvements in her condition. (R. 244-45). Specifically, she indicated that she felt less anxious and less depressed. (R. 244). However, she continued to complain of difficulty sleeping. (R. 244-45).

The next month, on May 27, 2008, Plaintiff returned to Dr. DiGilarmo, reportedly experiencing increased anxiety, depression, and stress. (R. 239). She also related feeling fatigue and vertigo. (R. 239). That same day, in a questionnaire for the state agency, Dr. DiGilarmo indicated that he had been seeing Plaintiff once every two weeks since October 2007 and that her symptoms of depression and anxiety had recently intensified. (R. 291). Dr. DiGilarmo's mental status examination of Plaintiff revealed poor concentration, poor short- and long-term memory, a somewhat dysthymic mood and flat affect, somewhat decreased social judgment, diminished insight, and concerns about employability. (R. 291-93). However, Plaintiff had a neat appearance, normal behavior, clear and fluent speech, no hallucinations or depersonalization, normal stream of thought, and normal information and intelligence. (R. 291-92). In addition, she demonstrated good test judgment, a good remote memory, and adequate impulse control. (R. 293).

Although Dr. DiGilarmo noted that Plaintiff demonstrated no difficulties performing daily activities or functioning socially, he concluded that Plaintiff's mental condition affected her ability to maintain a daily household routine, sustain attention long enough to complete tasks, remember appointments, complete assignments, and/or sustain work-related activities. (R. 293-94). He did not, however, provide any examples of Plaintiff's particular limitations, as he was prompted to do by the form. (R. 294). Instead, he noted only that Plaintiff "seemingly exhibit[ed] decreased concentration and decreased memory." (R. 294).

In a medical source statement completed for the state agency dated May 27, 2008, Dr. DiGilarmo indicated that Plaintiff had moderate limitations in understanding, remembering, and carrying out detailed instructions and responding to work pressures; slight limitations in making judgments on simple work-related decisions; and, at most, slight limitations interacting appropriately with the public, supervisors, and co-workers. (R. 296). While Dr. DiGilarmo found a marked limitation in Plaintiff's ability to respond appropriately to changes in a routine work setting, he indicated no limitations in Plaintiff's ability to understand, remember and carry out short, simple instructions. (R. 296). Asked to provide the medical and clinical support for his findings, Dr. DiGilarmo indicated that his assessment was based on Plaintiff's "work history prior to medical leave." (R. 296).

In a letter to Plaintiff's counsel dated November 17, 2008, Dr. DiGilarmo indicated that Plaintiff's treatment success to date was poor, but that his prognosis was guardedly optimistic. (R. 397). At the time of the letter, Dr. DiGilarmo had not seen Plaintiff since

June 10, 2008. (R. 397). In addition, Dr. DiGilarmo completed a second medical source statement, dated November 18, 2008, in which he opined that Plaintiff had seven marked limitations in her abilities. (R. 296, 404). Dr. DiGilarmo again based his assessment on "Plaintiff's history." (R. 404).

On February 18, 2009, nearly one month after the ALJ denied Plaintiff's claim, Plaintiff's counsel submitted a letter to the Appeals Council written by Dr. Snyder addressing the status of Plaintiff's syncope.[2] (R. 407). In the letter, Dr. Snyder indicated that, despite Plaintiff's negative tilt-table test, she was treated beginning in July 2007 for what Dr. Snyder diagnosed as vasodepressor syncope. (R. 407). He went on to note that Plaintiff "responded very well to Atenolol with decrease in lightheadedness." (R. 407).

In early October 2009, Plaintiff's counsel submitted three additional letters to the Appeals Council from Plaintiff's treating sources. In a letter originally addressed to Plaintiff's counsel and dated June 29, 2009, Dr. DiGilarmo noted that he continued to treat Plaintiff for depression and anxiety. (R. 410). In a pair of nearly identical letters dated August 25, 2009 and September 29, 2009, Dr. Snyder informed the Appeals Council that "Plaintiff is currently being plagued by severe bouts of depression along with panic attacks and anxiety episodes which are occurring almost every day." (R. 411, 414). Moreover, he

---

[2] The Appeals Council may consider new and material evidence only where it relates to the period on or before the date of the administrative hearing in determining whether the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record. *See* 20 C.F.R. § 404.970(b). However, when the plaintiff seeks to rely on evidence submitted for the first time to the Appeals Council, the district court may not remand unless the evidence presented is new and material and the plaintiff shows good cause for not previously presenting the evidence. *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001) (internal citations omitted).

opined that Plaintiff's depression was severe enough to preclude her from working full time.[3]
(R. 411)

### C.  Residual Functioning Capacity Finding

A Mental Residual Functioning Capacity ("RFC") was completed by state agency evaluator Roger Glover, Ph.D., on June 23, 2008.  (R. 302-04).  After reviewing Plaintiff's medical file, which included the report of Dr. DiGilarmo, Dr. Glover found that Plaintiff could "understand, remember, and follow simple job instructions, i.e. perform one-and two-step tasks; maintain regular attendance and be punctual; ask simple questions and accept instructions; maintain socially appropriate behavior; and function in production oriented jobs requiring little independent decision making." (R. 304).  Therefore, he opined that Plaintiff could meet the basic mental demands of competitive work on a sustained basis despite her limitations.  (R. 304).  In addition, although Dr. Glover considered the opinion of Dr. DiGilarmo, specifically his assessment of Plaintiff's abilities in the area of making occupational adjustments, Dr. Glover concluded that Dr. DiGilarmo's report was "without substantial support from the other evidence of record, which renders it less persuasive."  (R. 304).

### D.  Procedural History

Plaintiff protectively filed for DIB and SSI on April 15, 2008, claiming disability since September 27, 2007.  (R. 124).  The claims were denied on June 24, 2008, and Plaintiff

---

[3] In the August letter, Dr. Snyder wrote that Plaintiff's impairments precluded her from working "at this time." (R. 411). However, in the September letter, Dr. Snyder replaced that phrase with "for the past eight to nine months." (R. 414).

filed a timely written request for hearing on July 28, 2008.  (R. 42, 49).  An administrative

hearing was held on November 20, 2008 before Administrative Law Judge James J. Pileggi

("ALJ"), at which Plaintiff was represented by counsel and testified.  Also testifying was

Charles M. Cohen, Ph.D., an impartial vocational expert. (R. 11).

On January 21, 2009, the ALJ rendered an unfavorable decision to Plaintiff in which

he found that Plaintiff retained the ability to perform a full range of work at all exertional levels

but with the following non-exertional limitations: "she is limited to simple, repetitive tasks

involving routine work processes and settings; she cannot climb, balance, or use dangerous

machinery; she cannot work around unprotected heights; she must be in close proximity to

restroom facilities; she cannot engage in high stress work; she cannot work in an environment

where there are large crowds of people; she cannot work in close concert with co-workers; and

she would be unable to work in an environment with extreme temperatures or humidity."  (R.

15).  Thus, the ALJ concluded that Plaintiff was not "disabled" within the meaning of the Act

and was not eligible for DIB or SSI.

The ALJ's decision became the final decision of the Commissioner on July 29, 2009,

when the Appeals Council, after reviewing additional evidence submitted by the Plaintiff,

denied Plaintiff's request to review the decision of the ALJ.  (R. 1).

On September 27, 2010, Plaintiff filed her Complaint in this Court in which she

seeks judicial review of the decision of the ALJ.  The parties have filed cross-motions for

summary judgment.  Plaintiff alleges that (1) the ALJ improperly rejected the opinions of

Plaintiff's treating psychologist, Albert DiGilarmo, Psy.D.; (2) because the ALJ rejected the

opinions of Dr. DiGilarmo, he provided an inadequate RFC finding and inaccurate hypothetical question to the VE; and (3) the ALJ did not comply with Social Security Ruling ("SSR") 00-4p by failing to inquire into purported conflicts between the vocational expert's testimony and the definitions contained in the dictionary of occupational titles ("DOT") and obtain an explanation for such conflicts on the record. On the other hand, the Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence. The Court agrees with the Commissioner and will therefore grant the motion for summary judgment filed by the Commissioner and deny the motion for summary judgment filed by Plaintiff.

## III.     Legal Analysis

### A.     <u>Standard of Review</u>

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g)/1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Capato v. Commissioner of Social Security*, 631 F.3d 626, 628 (3d Cir. 2010) (internal citation omitted). It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Commissioner of Social Security*, 625 F.3d 798 (3d Cir. 2010).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920

(1995). This process requires the Commissioner to consider, in sequence, whether a claimant

(1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the

requirements of a listed impairment, (4) can return to his or her past relevant

work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520;

*Newell v. Commissioner of Social Security*, 347 F.3d 541, 545-46 (3d Cir. 2003) (*quoting*

*Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

      To qualify for disability benefits under the Act, a claimant must demonstrate that

there is some "medically determinable basis for an impairment that prevents him or her from

engaging in any substantial gainful activity for a statutory twelve-month period."

*Fargnoli v. Halter*, 247 F.2d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. §

423 (d)(1) (1982).

This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled *per se* because he
> or she suffers from one or more of a number of serious impairments delineated in 20
> C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S.
> 458 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d
> Cir. 2004); or,

> (2) in the event that claimant suffers from a less severe impairment, by
> demonstrating that he or she is nevertheless unable to engage in "any other kind of
> substantial gainful work which exists in the national economy . . . ." *Campbell*, 461
> U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

      In order to prove disability under the second method, a claimant must first

demonstrate the existence of a medically determinable disability that precludes plaintiff from

returning to his or her former job. *Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it

is shown that claimant is unable to resume his or her previous employment, the burden shifts to

the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart,* 312 F.3d 113, 119 (3d Cir. 2002).

Where a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify any one impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Commissioner of Social Security,* 577 F.2d 500, 502 (3d Cir. 2010); 42 U.S.C. § 423(d)(2)(C) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

In this case, the ALJ determined that Plaintiff was not disabled within the meaning of the Act at the fifth step of the sequential evaluation process. The ALJ based his conclusion on his finding that with vocational adjustment to work there are a significant number of low-stress jobs involving simple, repetitive tasks in the national economy that Plaintiff could perform despite the restrictions accounted for in Plaintiff's RFC assessment.

> **B.**     **Discussion**

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986), *cert. denied*, 482 U.S. 905

(1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Commissioner of Social Security,* 181 F.3d 429, 431 (3d Cir. 1999).

In her motion for summary judgment, Plaintiff alleges three (3) errors by the ALJ, generally contending that the opinions of her "longtime treating psychiatrist, Dr. DiGilarmo,"[4] were improperly rejected, which erroneously impacted the RFC finding and the hypothetical question posed to the VE. (Document No. 13). Further, Plaintiff contends that the ALJ should have resolved a purported conflict between the VE testimony concerning jobs existing in the national economy that Plaintiff could perform and the descriptions of those jobs found in the DOT. For its part, the Commissioner moves for summary judgment, averring that the ALJ appropriately weighed the medical evidence of record, and that his finding is therefore supported by substantial evidence. (Document No. 11). The Court will address Plaintiff's claims *ad seriatim.*

1. *The ALJ did not err in declining to adopt the medical opinions of Plaintiff's treating psychologist.*

Plaintiff's first alleged error is that the ALJ failed to give appropriate weight to the medical opinions of Plaintiff's treating psychologist, Dr. DiGilarmo, in finding that Plaintiff's impairments did not render her disabled within the meaning of the Act. The Court cannot agree.

---

[4] Plaintiff refers to Dr. DiGilarmo as a psychiatrist in her brief. However, the record reflects that Dr. DiGilarmo is in fact a licensed psychologist.

The United States Court of Appeals for the Third Circuit has held that an ALJ should accord "treating physicians' reports great weight, 'especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Brownawell v. Commissioner of Social Security,* 554 F.3d 352, 355 (3d Cir. 2008) *(quoting Morales v. Apfel,* 225 F.3d 310, 317 (3d Cir. 2000)); 20 C.F.R. § 404.1527(d)(2) (providing that a treating physician's opinion should receive controlling weight when it is well-supported by medical evidence and consistent with the other substantial evidence in the record). While an ALJ may not draw speculative inferences from medical reports or base his decision on his own "credibility judgments, speculation, or lay opinion," he may reject a treating physician's opinion outright on the basis of conflicting evidence in the record. *Morales,* 225 F.3d at 317-18 (*citing Plummer v. Apfel,* 186 F.3d 422, 429 (3d Cir. 1999)); *see Frankenfield v. Bowen*, 861 F.2d 405 (3d Cir. 1988). However, in doing so an ALJ must at least "consider all the evidence and give some reason for discounting the evidence she rejects." *Plummer,* 186 F.3d at 429.

At the same time, while an ALJ may not discount a treating physician's opinion without contradictory medical evidence on the record, a treating physician's report may be given "more or less weight depending on the extent to which supporting explanations are provided." *Plummer,* 186 F.3d at 429. Importantly, where a treating physician's opinion as to disability is unaccompanied by a thorough written report, its reliability is suspect. *See Brewster v. Heckler,* 786 F.2d 581, 585 (3d Cir. 1986).

The record indicates that Dr. DiGilarmo saw Plaintiff approximately once every two weeks from October 2007 to June 2008. (R. 398). Dr. DiGilarmo opined on several occasions that Plaintiff's depression and anxiety rendered her incapable of working. His medical opinions, however, are not dispositive of the issue of disability. *See Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) (*citing Wright v. Sullivan*, 900 F.2d 675, 683 (3d. Cir 1990) ("this type of [medical] conclusion cannot be controlling")). While such statements must always be considered, they are not entitled to special significance because a finding of disability is ultimately a legal determination reserved for the Commissioner. *See* 20 C.F.R. 404.1527(e)(1-2). It must be made after reviewing the entirety of the evidence in support of the treating physician's opinions and weighing it against the reports of other physicians who have examined the Plaintiff or reviewed the Plaintiff's medical record. *See Adorno*, 40 F.3d at 48 (*citing Cotter v. Harris*, 642 F.2d 700, 705, *reh'g denied*, 650 F.2d 481 (3d Cir. 1981)).

The ALJ did not accord controlling weight to Dr. DiGilarmo's opinions because he found that "Dr. DiGilarmo offered very little medical evidence to support his conclusions." A review of the record confirms the ALJ's finding. Dr. DiGilarmo indicated in a November 17, 2008 letter to Plaintiff's counsel that Plaintiff's impairments placed her within Listings 12.04 (Affective Disorder) and 12.06 (Anxiety Related Disorder) of 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 397), but he did not supply a written report explaining his conclusions. Similarly, in a physical RFC questionnaire dated November 18, 2008 – two days before Plaintiff's administrative hearing – Dr. DiGilarmo offered only "patient's clinical history" as

support for his assertion that plaintiff was incapable of working even low-stress jobs. (R. 403-05).

Further, though Dr. DiGilarmo had not seen Plaintiff since June 2008, the findings in a medical source statement accompanying his November 18, 2008, letter differed from those in a prior medical source statement completed in May 2008. In the prior statement, Dr. DiGilarmo noted, based on Plaintiff's "work history prior to her medical leave," only one marked limitation in Plaintiff's capabilities. (R. 296). However, in November 2008, Dr. DiGilarmo indicated several marked limitations without providing a reason for changing his assessment or any explanation for his conclusions beyond "[Plaintiff's] history." "In light of such unsupported and internally contradictory evidence, the ALJ correctly determined that the opinions of [Plaintiff's] treating [psychologist] were not controlling." *Jones v. Sullivan,* 954 F.2d 125, 129 (3d Cir. 1991) (*citing Wright*, 900 F.2d at 683; *Newhouse v. Heckler*, 753 F.2d 283, 296 (3d Cir. 1985)).

The state agency psychologist who reviewed Plaintiff's medical record, and whose opinions the ALJ adopted, found that Plaintiff experienced only mild limitations in daily activities and moderate limitations in social functioning and concentration, persistence, and pace. (R. 302-03). Having reviewed Dr. DiGilarmo's report dated June 2008, the state psychologist indicated that his RFC assessment differed from that of Dr. DiGilarmo because some of Dr. DiGilarmo's opinions were overestimates of the severity of Plaintiff's restrictions. (R. 304). Further, the state psychologist found Dr. DiGilarmo's opinions unpersuasive because they were unsupported by other evidence of record. (R. 304). He thus concluded that, contrary

to Dr. DiGilarmo's assessment, Plaintiff could meet the demands of competitive work on a sustained basis despite her limitations. (R. 304).

As the ALJ stated in his decision, the state consultant's findings were "consistent with the record as a whole regarding [Plaintiff's] non-exertional limitations." (R. 17). The record reveals that both a tilt-table study and a CT scan of Plaintiff returned normal results. (R. 178, 328). Plaintiff's primary care physician Dr. Snyder noted several times in the record that Plaintiff's light-headedness and fatigue were controlled by her medication. Indeed, Plaintiff testified that her medication prevented her from fainting. (R. 27). Plaintiff's symptoms of depression had also shown improvement throughout March and April 2008. (R. 244-45, 376). The state consultant's findings were also consistent with Plaintiff's own May 2008 Function Report, in which she reported a ride range of daily activities: caring for her children and pet, doing housework, preparing meals, driving, grocery shopping, and managing her finances. (R. 140-41). In addition, the RFC finding submitted by the state psychologist indicated that Plaintiff experienced several of the same limitations which Dr. DiGilarmo identified in his initial medical source statement of May 2008, including moderate restrictions in Plaintiff's ability to understand, remember and carry out short, simple instructions. (R. 296, 303).

Having considered Dr. DiGilarmo's opinions and explained his reason for rejecting them, the ALJ was "free to choose the medical opinion of one physician over that of another," *Diaz v. Commissioner of Social Security*, 557 F.3d 500, 505 (3d Cir. 2009) (*citing Cotter*, 642 F.2d at 705)), even though the source of that opinion had not examined Plaintiff. *See Jones,* 954 F.2d at 129. And, in fact, the ALJ accommodated the limitations identified by Dr.

DiGilarmo in the hypothetical question he posed to the VE. Accordingly, the Court finds that substantial evidence supports the ALJ's decision to reject Dr. DiGilarmo's opinions in favor of contradictory medical evidence in the record. Because the ALJ did not err in declining to give Dr. DiGilarmo's opinion controlling weight, the Court will also dismiss Plaintiff's second contention and find that the ALJ accurately portrayed Plaintiff's limitations in his hypothetical question posed to the VE.

2. *The ALJ inquired on the record whether a conflict existed between the VE testimony and the DOT, in accordance with SSR 00-4p, and any purported conflict was not so clear that the ALJ should have pursued the question further.*

Next, Plaintiff challenges the ALJ's determination at the fifth step of the sequential evaluation. She contends that the ALJ erred in failing to reconcile on the record a purported conflict between the VE's testimony and the descriptions in the DOT regarding the jobs the VE identified as ones Plaintiff could perform. In the ALJ's RFC determination, he found that Plaintiff was limited to employment consisting of "simple, repetitive tasks [and] routine work processes and settings." (R. 15). The ALJ posed a hypothetical question to the VE based on his RFC assessment. In response to the hypothetical, the VE testified that an individual with Plaintiff's limitations would be able to perform the requirements of representative occupations, such as "inspector," "packer," and "assembler." (R. 15). Thus, the ALJ, relying on the VE's testimony, found that jobs exist in significant numbers in the national economy that Plaintiff could perform. (R. 18).

Plaintiff argues that, in the DOT, all of the listings contained within the three categories of jobs provided by the VE, with only one exception, require reasoning levels of 2 or higher. As such, they do not comport with the ALJ's mandate that Plaintiff's work be "simple" or "routine," which, according to Plaintiff, corresponds only with jobs requiring level-1 reasoning skills. Plaintiff contends that, under SSR 00-4p, the ALJ had a duty to resolve this alleged conflict and that his failure to do so renders his finding at step five devoid of substantial evidence. For the reasons that follow, this Court is not persuaded by Plaintiff's argument.

The United States Court of Appeals for the Third Circuit has interpreted SSR 00-4p as requiring an ALJ to "ask the vocational expert whether any possible conflict exists between the vocational expert's testimony and the DOT," and if a conflict appears to exist, "to elicit a reasonable explanation for the apparent conflict." *Burns*, 312 F.3d at 127. Here, the hearing transcript reveals that the ALJ specifically asked the VE whether the testimony he provided as to the jobs Plaintiff could perform was consistent with the DOT's descriptions of those jobs, to which the VE responded in the affirmative. (R. 37). Plaintiff's counsel did not question the VE about any inconsistency during cross-examination. The ALJ then stated in his decision "[p]ursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the [DOT]." (R. 18).

Although the Third Circuit has not ruled on this issue, this Court finds the Seventh Circuit's decision in *Terry v. Astrue*, 580 F.3d 471 (7th Cir. 2009) applicable to the facts of this case. In *Terry*, while reversing and remanding on other grounds, the Seventh Circuit stated that "[b]ecause [the claimant] did not identify any conflict at the hearing, she would have to show

21

that the conflict was obvious enough that the ALJ should have picked up on it without any assistance." *Id.* at 478 (brackets in original).

Plaintiff has not carried that burden. While it is Plaintiff's contention that even a reasoning level of 2 is incompatible with the ALJ's determination that she is limited to "simple" and "routine" jobs, the Third Circuit has made clear that "[w]orking at reasoning level 2 would not contradict the mandate that [Plaintiff's] work be simple, routine and repetitive." *Money v. Barnhart*, 91 Fed.Appx. 210, 215 (3d Cir. 2004). Allowing for jobs requiring reasoning levels 1 and 2, a review of the jobs listed in the DOT within the three categories the VE listed establishes that there are numerous jobs which meet the ALJ's stated RFC for Plaintiff. Accordingly, the purported discrepancy between the VE evidence and the DOT was "not so obvious that the ALJ should have pursued the question." *Terry*, 580 F.3d at 478. Therefore, it is clear from the record that the ALJ fully complied with SSR 00-4p and his finding at step five is supported by substantial evidence.

## IV. Conclusion

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act, and that she is able to perform a wide range of work at all exertional levels.

For these reasons, the Court will grant the Motion for Summary Judgment filed by the Commissioner and deny the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JENNIFER MYERS              )
                                    )
                                    )
          Plaintiff,          )
                                    )
          v.                  )      02: 10-cv-1254
                                    )
MICHAEL J. ASTRUE,         )
COMMISSIONER OF SOCIAL SECURITY,  )
                                    )
          Defendant.       )

**ORDER OF COURT**

**AND NOW**, this 28th day of June, 2011, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1.      Plaintiff's motion for summary judgment is **DENIED**.

2.      Defendant's motions for summary judgment is **GRANTED**.

3.      The Clerk will docket this case as closed.

BY THE COURT:

<u>s/Terrence F. McVerry</u>
United States District  Court Judge

cc:     Karl E. Osterhout, Esquire
        Email: karl@keolaw.com

Michael Colville
United States Attorney's Office
Email: Michael.colville@usdoj.gov